## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | 2:07-cr-00294 |
| | ) | |
| | ) | |
| CARL SAUNDERS, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

**Mark R. Hornak, Chief United States District Judge**

On October 15, 2009, Mr. Carl Saunders was sentenced to a term of imprisonment of two hundred four (204) months followed by a term of supervised release of five (5) years. (ECF No. 79.) On November 10, 2020, Mr. Saunders was diagnosed with stage IVb follicular lymphoma. Prior to his cancer diagnosis, Mr. Saunders was housed at United States Penitentiary ("USP") Thomson in Thomson, Illinois, but he now resides at Federal Medical Center ("FMC") Butner in Durham County, North Carolina where he is undergoing chemotherapy treatment. Mr. Saunders's anticipated release date from federal custody is October 15, 2023. On April 8, 2021, Mr. Saunders filed a Motion for Reduction of Sentence Pursuant to 18 U.S.C § 3582(c)(1)(A)(i). (ECF No. 98.)

The medical records before the Court show that beginning in May 2020 and until Mr. Saunders's cancer diagnosis in November/December 2020, Mr. Saunders reported swollen lymph nodes (presenting as lumps on his rib cage and neck, growing overtime) (ECF Nos. 98-1, at 1; 98-2, at 1–2; 98-3, at 1; 98-4; 98-5; and 98-6, at 1), unexplained weight loss (ECF No. 98-8, at 1), as well as some intermittent insomnia and night sweats (ECF No. 98-8, at 1). In addition to his advanced-stage cancer, Mr. Saunders's medical records indicate that has been diagnosed with the following: generalized bulky lymphadenopathy, hepatosplenomegaly, anemia, thrombocytopenia,

1

an enlarged spleen, a soft nodule in his left flank, and an Achilles tendon injury (that appears to have improved with physical therapy). (ECF Nos. 98-5, at 1; 98-13, at 21; and 102-1, at 11.) In December 2020, just prior to his transfer to FMC Butner, the record reflects that Mr. Saunders contracted COVID-19. (ECF No. 98-8.) He has since recovered (*id.*), but the COVID-19 infection delayed Mr. Saunders's transfer to FMC Butner until January 2021. Finally, the medical records show that Mr. Saunders is responding well to chemotherapy (ECF Nos. 102-1, at 9, and 102-2, at 1), and that despite being offered the Pfizer COVID-19 vaccine, Mr. Saunders refused vaccination on April 6, 2021. (ECF No. 102-3.)

Based on the record now before it, the Court concludes that Mr. Saunders's Motion is properly before it and that his medical conditions, specifically his advanced-stage cancer diagnosis, rise to an "extraordinary and compelling" level. However, the Court ultimately concludes that the sentencing factors set forth in 18 U.S.C. § 3553(a) counsel against a reduction in Mr. Saunders's original sentence. Accordingly, Mr. Saunders's Motion for Reduction of Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) at ECF No. 98 is DENIED without prejudice.

## I.    BACKGROUND

On July 1, 2009, Mr. Saunders pleaded guilty to three counts of bank robbery and two counts of armed bank robbery. (ECF No. 71.) The sentencing court imposed a two hundred four (204) month term of imprisonment at counts two, four, and five, to run concurrently, followed by a five-year term of supervised release at each count, also to run concurrently. (ECF No. 79.) No sentence was imposed at counts one and three. (*Id.*) The Court additionally imposed a three hundred ($300) dollar special assessment. (ECF No. 79.)

On April 8, 2021, Mr. Saunders filed a Motion for Reduction of Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), primarily arguing that extraordinary and compelling circumstances

warranting a reduced sentence exist because (1) Mr. Saunders's stage IVb follicular lymphoma diagnosis, (2) his immunocompromised state due to chemotherapy treatment, and (3) his age together place Mr. Saunders at a heightened risk of severe illness if he were to be reinfected with COVID-19. (ECF No. 98, at 11–18.) Mr. Saunders further contends that a reduction in sentence to time served is warranted under the § 3553(a) factors because he has now been in custody for fourteen (14) years; he does not pose a present danger to the community if released; and in light of his medically vulnerable state, compassionate release is warranted to avoid converting his original sentence—one that was sufficient but not greater than necessary at the time of sentencing —to one that is "immeasurably greater than necessary" in light of the pandemic. (*Id.* at 18–21 (quoting *United States v. Park*, No. 16-00473, 2020 WL 1970603, at *5 (S.D.N.Y. Apr. 24, 2021)).)

The Government opposes Mr. Saunders's Motion (ECF No. 102) and argues that Mr. Saunders does not meet the "extraordinary and compelling" criteria and that "any sentence reduction would be inconsistent with either § 1B1.13 of the United States Sentencing Guidelines (USSG) or the § 3553(a) factors[.]" (*Id.* at 1.) Specifically, the Government contends that Mr. Saunders's medical condition does not create extraordinary and compelling reasons warranting release because (a) he is responding well to treatment and releasing Mr. Saunders now would likely disrupt his medical care, and (b) even if the Court considers Mr. Saunders's cancer a "serious medical condition," the medical records show that his ability to provide self-care in the custodial environment is not substantially diminished. (*Id.* at 9.) The Government also points out that Mr. Saunders declined the Pfizer COVID-19 vaccine without providing any reason for his decision, which it says necessarily undermines his extraordinary and compelling circumstances argument. (*Id.* at 10–12.) Moreover, the Government suggests that Mr. Saunders may nonetheless "be

afforded at least some protection" from COVID-19 "due to antibodies he likely developed when he contracted and recovered from the virus in or about December 2020." (*Id*. at 13.) Finally, under the sentencing consideration prong, the Government argues that Mr. Saunders "does not meet the criteria for a sentence reduction under Section 3553(a)" due to the "seriousness of his offense, his significant criminal history, and lack of rehabilitation [while incarcerated]." (*Id*. at 2.)

Mr. Saunders replied to the Government's opposition (ECF No. 105), and the Court held oral argument on the Motion on May 17, 2021. No testimony was adduced at the hearing, and the Court heard only legal argument as to the live Motion. After the record closed in this matter, Mr. Saunders filed a supplement (ECF No. 109) to which the Government responded. (ECF No. 110.) The Court accepts both Mr. Saunders's supplement and the Government's response into the record. With that, the record is now closed, and the matter ripe for the Court's consideration.

## II.  <u>LEGAL STANDARD</u>

"[A]s a general matter, a court cannot modify a term of imprisonment after it has been imposed without specific authorization." *McMillan v. United States*, 257 F. App'x 477, 479 (3d Cir. 2007); *see also Dillon v. United States*, 560 U.S. 817, 819 (2010). One such specific authorization is the First Step Act's amendment of 18 U.S.C. § 3582. As amended, that provision allows a court to modify a defendant's term of imprisonment if "extraordinary and compelling reasons warrant such a reduction." § 3582(c)(1)(A)(i). In addition, the court must consider: (1) whether the defendant has exhausted the appropriate administrative remedies; (2) the factors set forth in 18 U.S.C. § 3553(a) to the extent that they are applicable; and (3) whether such a reduction is consistent with applicable policy statements issued by the Sentencing Commission. § 3582(c)(1)(A).

III. **DISCUSSION**

After considering the relevant factors, the Court finds and concludes that Mr. Saunders's Motion is properly before it. Additionally, the Court finds that Mr. Saunders's advanced-stage cancer diagnosis, both on its own and as exacerbated by his particularized risk of severe illness should he contract the COVID-19 virus a second time, rises to an "extraordinary and compelling" level. In then considering the § 3553(a) factors as the Court is obligated to do, the Court concludes that releasing Mr. Saunders from custody at this time would be inconsistent with the purposes of sentencing in this case and is thus inappropriate on the record now before the Court.

A. **Administrative Exhaustion**

To consider the merits of Mr. Saunders's Motion, the Court must first determine whether Mr. Saunders has complied with § 3582(c)(1)(A)'s exhaustion requirement. Prior to petitioning a court for relief under § 3582(c), a defendant must first file an administrative request for compassionate release with the warden of their facility and then either: (1) fully exhaust the Bureau of Prison's ("BOP") administrative remedies; or (2) wait thirty (30) days from the date their administrative request was filed with the warden. The Third Circuit has confirmed that either of § 3582(c)(1)(A)'s options (acting independently of one another) are sufficient to satisfy the exhaustion requirement. *See United States v. Harris*, 973 F.3d 170, 171 (3d Cir. 2020) (rejecting the argument that a defendant is required to completely exhaust the administrative remedy process if the warden denies a request within thirty (30) days of receiving it, primarily because "the statute states that the defendant may file the motion [before a district court] thirty days after the warden receives his request").

Here, the Court concludes that Mr. Saunders has fully exhausted his administrative request. On December 4, 2020, Mr. Saunders submitted a request for compassionate release to the Warden

of USP Thomson, the BOP facility where Mr. Saunders then resided. (ECF No. 101-1.) The Warden considered Mr. Saunders's concerns regarding his cancer diagnosis as well as his concerns about contracting COVID-19 in light of his medical conditions and denied Mr. Saunders's request on January 5, 2021. (ECF No. 101-2.) The Government does not contest exhaustion. (ECF No. 102, at 4–5.) Because more than thirty (30) days have passed since he submitted his request to the BOP, the Court concludes that Mr. Saunders has exhausted his administrative filing obligations, and the Motion is now properly before the Court.

**B. "Extraordinary and Compelling" Reasons**

Next, the Court must determine whether Mr. Saunders's cancer diagnosis, by its very nature and as exacerbated by the still ongoing COVID-19 pandemic, rises to an "extraordinary and compelling" level, such that consideration of release from prison would be permitted by § 3582(c)(1)(A)(i). It does.

Section 3582 does not define the phrase "extraordinary and compelling reasons." Instead, Congress delegated that task to the Sentencing Commission. *See* 28 U.S.C. § 994(t) (stating that the Sentencing Commission "shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples"). The Sentencing Commission defined "extraordinary and compelling" as it related to the BOP's discretion under the pre-First Step Act version of § 3582(c)(1)(A)(i), but has not updated the applicable Policy Statement, found in the U.S. Sentencing Guidelines Manual ("the Guidelines"), since the First Step Act became law. *See United States v. Rodriguez*, 451 F. Supp. 3d 392, 396 (E.D. Pa. Apr. 1, 2020).

A question that arises in this matter, and has arisen in other similar cases, is whether, and if so to what degree, the current provisions of the Guidelines and relevant Application Notes at

U.S.S.G. § 1B1.13 promulgated by the Sentencing Commission in 2018 are applicable in consideration of this Motion. As a general matter, this Court has been of the view that those provisions of the Guidelines are informative but not controlling and in any event advisory. *See, e.g.*, *United States v. Davidson*, No. 16-00139, 2020 WL 4877255, at *17–18 (W.D. Pa. Aug. 20, 2020). Over the past few months, a number of the regional Courts of Appeals have considered this issue, and all but one have held that those Guidelines provisions are not controlling and limiting in the consideration of compassionate release motions. *See United States v. Long*, No. 20-3064, 2021 WL 1972245, at *8–9 (D.C. Cir. May 18, 2021); *United States v. Aruda*, No. 20-10245, 2021 WL 1307884, at *4 (9th Cir. Apr. 8, 2021) (*per curiam*); *United States v. Shkambi*, No. 20-40543, 2021 WL 1291609, at *2–4 (5th Cir. Apr. 7, 2021); *United States v. McGee*, No. 20-5047, 2021 WL 1168980, at *12 (10th Cir. Mar. 29, 2021); *United States v. McCoy*, 981 F.3d 271, 281–84 (4th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1109 (6th Cir. 2020); *United States v. Brooker*, 976 F.3d 228, 234–37 (2d Cir. 2020); *but see United States v. Bryant*, No. 19-14267, 2021 WL 1827158, at *13 (11th Cir. May 7, 2021) (holding that § 1B1.13 is an applicable, binding policy statement for all section 3582(c)(1)(A) motions).[1] And in this case and in others in this Court, it has been the position of

---

[1] This Court finds particularly persuasive the portions of Judge Martin's dissent in *Bryant* that observe that applying U.S.S.G. § 1B1.13 and its Application Note 1(D) to compassionate release motions filed not by the BOP but by a defendant would result in an unauthorized sub-delegation of authority to the BOP. *Bryant*, 2021 WL 1827158, at *22. The actual text of the Guideline authorizes the Court when such a motion is pending to reduce a sentence if "extraordinary and compelling reasons warrant the reduction." U.S.S.G. § 1B1.13(1)(A). But it is only in Application Note 1 (and not in the Guideline itself) that the Sentencing Commission outlined such reasons definitionally, closing with a "catch all" provision, "Other Reasons," in subsection (D). That Application Note provides that such conditions could exist if the Director of the BOP determined that they existed (without any Guideline or Application Note assistance provided) *as to that particular defendant in that particular case*.

   This Court finds persuasive the *Bryant* dissent's assessment that giving that provision conclusive force as to a defendant-filed motion would be both an impermissible sub-delegation of authority to the BOP, and would be counter to the purposes of the First Step Act which were aimed at removing the BOP's exclusive role as to such motions, since in a circular fashion it in effect flips the release decision back to the BOP and away from the Court. And beyond that, given that the Guideline itself does not endeavor to define the term "extraordinary and compelling" at all, instead leaving it to an Application Note that drops most of that definitional work into the lap of the (cont.)

the United States that § 1B1.13 is so limiting, notwithstanding that those provisions have not been considered or updated by the Sentencing Commission since Congress passed and the President signed into law the First Step Act. *See id.*

This issue is now before our Court of Appeals in a significantly different and perhaps more consequential permutation in *United States v. Andrews*, in which the key issue before that court is whether a court's discretion to determine and define "extraordinary and compelling reasons" is constrained by U.S.S.G. § 1B1.13 and its commentary, specifically in circumstances when such are asserted to exist due to a gross disparity between a sentence originally imposed and a sentence that would be imposed today for the same crime. 480 F. Supp. 3d 669 (E.D. Pa. 2020), *appeal docketed,* No. 20-2768 (3d Cir. Sept. 4, 2020).

This case instead involves a request for relief on the basis of Mr. Saunders's current medical conditions. Although it appears that the central issue in *Andrews* is broader and perhaps of greater reach than the central issue in this case, the involved statutory and Guidelines provisions suggest that a defendant's medical conditions are a topic central to the principles that have animated the concept of such release from its first appearance in the law. For our purposes, the only issue that need be addressed and resolved now is whether the referenced Guidelines provisions are controlling and therefore set and limit the scope of the factors that the Court may consider. To that extent, we join the view of the strong majority of the decisions noted above in concluding that the provisions of U.S.S.G. § 1B1.13 and its Application Notes are not limiting in deciding this issue in the context presented here. The provisions of U.S.S.G. § 1B1.13 and its Application Notes do not serve as a binding limitation on the factors or information that this Court may consider in deciding this specific

---

Director of the BOP, this Court harbors meaningful doubt that such an approach, and the Application Note itself, would retain vitality in light of the *en banc* decision of our Court of Appeals in *United States v. Nasir*, 982 F. 3d 144, 156–60 (3d Cir. 2020), and its limitations on when the text of an Application Note may permissibly expand the reach of the Guideline itself.

Motion on the grounds presented in this case, but the Court will nonetheless consider them as an advisory part of its analysis in determining the issue now before the Court.

## 1. Mr. Saunders's Advanced-Stage Cancer Diagnosis

Particular to Mr. Saunders's situation, the Application Notes to § 1B1.13 of the Guidelines speak to conditions that would support compassionate release in the form of non-terminal medical conditions that can rise to an "extraordinary and compelling" level.[2] The Sentencing Commission's Policy Statement suggests that non-terminal medical conditions may constitute extraordinary and compelling reasons if "a defendant is suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." § 1B1.13, cmt. n.(1)(A)(ii). The Court finds that Mr. Saunders's stage IVb follicular lymphoma diagnosis, both on its own and paired with the additional risks that he faces in a congregate prison setting due to the still ongoing COVID-19 pandemic, would rise to an "extraordinary and compelling" level pursuant to the "non-terminal" option.

### a. Stage IVb Follicular Lymphoma Presents Extraordinary and Compelling Circumstances Independent of the COVID-19 Pandemic

First, the Court finds that Mr. Saunders's advanced-stage cancer diagnosis, even without considering the risks associated with the COVID-19 pandemic in a congregate prison setting, establishes extraordinary and compelling circumstances. The record shows that in November 2020, Mr. Saunders was diagnosed with stage IVb follicular lymphoma, an incurable form of cancer. *See*

---

[2] Although a "specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required" to prove that an illness is "terminal," Mr. Saunders made clear during oral argument that he does not move for compassionate release/reduction in sentence on the grounds that he suffers from a "terminal illness," as defined within the Application Notes to the Sentencing Guidelines. *See* U.S.S.G. § 1B1.13, cmt. n.(1)(A)(i). As such, the Court does not consider his motion under the "terminal illness" option.

*Follicular Lymphoma*, Lymphoma Rsch. Found. (2021), lymphoma.org/aboutlymphoma/nhl/fl. In the beginning stages of his diagnosis, Mr. Saunders's medical records indicate that his "International Prognostic Index" ("IPI") risk—a predictive model designed to assist medical professionals in estimating life expectancy prognoses and designing treatment plans—was "category high risk." (ECF No. 98-9, at 2.) According to medical literature on follicular lymphoma, an IPI high-risk category translates to the following life expectancy rates: 52.5% of individuals diagnosed with follicular lymphoma and classified as IPI high risk have a five-year survival rate, and 35.5% of individuals diagnosed have a ten-year survival rate. *See International Prognostic Index for Follicular Lymphoma*, Oncology Pro, Mass. Med. Soc'y (2008), https://oncologypro.esmo.org/oncology-in-practice/practice-tools/international-prognostic-index-tools-for-lymphoma/international-prognostic-index-for-follicular-lymphoma; *see also A Predictive Model for Aggressive Non-Hodgkin's Lymphoma: The International Non-Hodgkin's Lymphoma Prognostic Factors Project*, Nat'l Lib. Med. (Sept. 30, 1993), https://www.nejm.org/doi/pdf/10.1056/NEJM199309303291402.

USP Thomson did not have the medical infrastructure necessary to administer the care Mr. Saunders's cancer diagnosis required (ECF No. 98-10, at 1), so the BOP transferred Mr. Saunders to FMC Butner in January 2021 to start his chemotherapy treatment. However, his transfer was initially delayed because Mr. Saunders contracted COVID-19 on December 8, 2020, and he was placed on quarantine until he recovered. (ECF No. 98-8.) After his COVID-19 infection cleared but before his ultimate transfer to FMC Butner, Mr. Saunders received his first doses of chemotherapy in late December 2020/early- to mid-January 2021 at Mercy Medical Center in Clinton, Iowa. (ECF Nos. 98-9 and 98-10.) The records show that Mr. Saunders was then transferred to FMC Butner in either late January or early February 2021 for a more suitable, long-term set-up to last the duration of his chemotherapy treatment. (ECF No. 102-1, at 1, 5.) It is

anticipated that Mr. Saunders will receive two to three more rounds of chemotherapy. (ECF No. 102-1, at 9.) The record reflects that as a result of the chemotherapy treatment to date, Mr. Saunders has experienced weight loss (ECF No. 98-10, at 1) and adverse skin reactions. (ECF No. 98-12, at 2.) Although some of those symptoms have subsided, and it is reported that Mr. Saunders is responding well to treatment—according to FMC Butner's oncologist, Mr. Saunders's life expectancy prognosis is 10–20 years, which presents a more positive prediction than Mr. Saunders's initial IPI-high risk category prognosis (ECF Nos. 102-1, at 9; and 102-2)—Mr. Saunders's battle with cancer is far from over: the record shows that he will need to complete several more rounds of chemotherapy. (ECF No. 102-1, at 9.)

Even after Mr. Saunders is administered his last doses of Bendamustine and Rituxan (chemotherapy drugs), Mr. Saunders's continued reality is that he is living with an incurable and chronic form of cancer. While treatment may mitigate its spreading and perhaps even send the cancer into remission, Mr. Saunders's reality of living with a serious health condition like cancer will be unchanged—and most certainly one that will remain unchanged for the remaining duration of his prison sentence. The Court also notes that, as reflected in the record, a custodial environment presents additional challenges impeding Mr. Saunders's ability to assist in his own recovery—for example, Mr. Saunders has been unable to follow a high-protein diet as prescribed to sustain his bodyweight during chemotherapy, a challenge due in large part to limited prison menu options. (ECF No. 98-12, at 10.)

For the remainder of Mr. Saunders's life, while in custody and even upon his eventual release in October 2023, an advanced-stage cancer diagnosis will follow him. Further chemotherapy treatments may be necessary to keep the cancer at bay. And while Mr. Saunders's current life expectancy prognosis is 10–20 years, at least according to the BOP medical doctors, that prognosis

is subject to change—hopefully, for the better, but in the Court's estimation, it is not outside of the realm of possibility that his prognosis could change for the worse. In sum, the Court finds and concludes that on the record as now exists, the circumstances surrounding Mr. Saunders's experience of living with an incurable cancer in a custodial setting, alongside the extensive and taxing treatment it requires, establish that Mr. Saunders's medical conditions rise to the level of extraordinary and compelling circumstances.

   **b.**  **<u>Stage IVb Follicular Lymphoma Presents Extraordinary and Compelling</u>**
     **<u>Circumstances in Light of the COVID-19 Pandemic</u>**

   Second, the Court finds that if Mr. Saunders were to contract COVID-19 for a second time —which is plausible given the inherent risks of infection in a congregate prison setting and past COVID-19 infection rates at FMC Butner and USP Thomson—he would likely be at an increased risk of severe illness due to his cancer diagnosis, his current immunocompromised state, and his age. As such, the Court concludes that these circumstances rise to an extraordinary and compelling level. According to the Centers for Disease Control and Prevention ("CDC"), Mr. Saunders's cancer diagnosis and chemotherapy treatment "can" make him more likely to get severely ill from COVID-19. *See* Ctrs. for Disease Control & Prevention, *People with Certain Medical Conditions*, https://bit.ly/3iZBI5M (last updated May 13, 2021). And although FMC Butner does not presently report active COVID-19 cases among staff and inmates, the Court observes that Mr. Saunders's risk of reinfection remains higher in a custodial environment than outside a custodial environment, given the inherent conditions of congregate living. (ECF No. 98, at 16.) In addition to his cancer diagnosis and active chemotherapy treatment, Mr. Saunders also argues that his age (53) places him at an increased risk of illness or death if he were to contract COVID-19 a second time. (ECF No. 98, at 12.)

The Court finds that Mr. Saunders's age, in combination with his cancer diagnosis and active chemotherapy treatment, does in fact place him at an increased risk of COVID-19 infection, hospitalization, and death. *See* Ctrs. for Disease Control & Prevention, *Risk for COVID-19 Infection, Hospitalization, and Death by Age Group*, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-age.html (last updated Feb. 18, 2021); Ctrs. for Disease Control & Prevention, *People with Certain Medical Conditions*, https://bit.ly/3iZBI5M (last updated May 13, 2021) (explaining that "95% of COVID-19 deaths occur in people older than 45" and also noting that "[s]tudies have shown people from racial and ethnic minority groups are also dying from COVID-19 at younger ages").

Finally, the record does not firmly establish that because Mr. Saunders contracted and recovered from the virus he is now protected from reinfection or from severe illness if he were to contract COVID-19 a second time—an argument that is presented by the Government, *see* ECF No. 102, at 13. While the Court notes that the National Cancer Institute has concluded that those "who have a positive antibody test . . . have substantial immunity to SARs-CoV-2 and are at a lower risk for future infection," *see* Norman E. Sharpless, M.D., *SARS-Cov-2 Antibodies Can Protect from Reinfection*, Nat'l Cancer Inst. (Dec. 21, 2020), https://www.cancer.gov/news-events/cancer-currents-blog/2020/coronavirus-antibodies-protect-against-future-infection, other factors, which the Court outlines below, riddle this assertion with uncertainty. As such, the Court does not accord much weight to the Government's argument.

First, the Court takes judicial notice of a recent U.S. Food and Drug Administration press release, published on May 19, 2021, recommending that "antibody tests should not be used at this time to determine immunity or protection against COVID-19 at any time[.]" Press Release, U.S. Food & Drug Admin., FDA In Brief: FDA Advises Against Use of SARS-CoV-2 Antibody Test

Results to Evaluate Immunity or Protection From COVID-19, Including After Vaccination (May 19, 2021), *available at* https://www.fda.gov/news-events/press-announcements/fda-brief-fda-advises-against-use-sars-cov-2-antibody-test-results-evaluate-immunity-or-protection. Other factors calling into question the assertion that Mr. Saunders's alleged antibodies afford him protection are as follows: (a) the risk of COVID-19 reinfection "appears to be somewhat higher for those who have tested positive for the virus but appear to be asymptotic or minimally symptomatic," *see United States v. Walls*, Nos. 16-00249, 12-00173, 2020 WL 6390597, at *10 (W.D. Pa. Nov. 2, 2020), which is the situation presented in Mr. Saunders's case; (b) it is unknown how much protection COVID-19 antibodies acquired by a COVID-19 infection might provide, *see* Ctrs. for Disease Control & Prevention, *Test for Past Infection*, https://www.cdc.gov/coronavirus/ 2019-ncov/testing/ serology-overview.html (last updated Feb. 2, 2021), or how long any such protection might last (here, almost six months have passed since Mr. Saunders's initial infection), *see Prior COVID-19 Infection Offers Protection from Re-Infection for at Least Six Months*, Univ. Oxford (Nov. 20, 2020), https://www.ox.ac.uk/news/2020-11-20-prior-covid-19-infection-offers-protection-re-infection-least-six-months; and (c) Mr. Saunders began chemotherapy in late December 2020 or early January 2021, a treatment that suppresses his immune system's ability to mount responses to infections.

Moving beyond the present uncertainty surrounding the duration and extent of protection provided by any infection-generated COVID-19 antibodies, the Court focuses on what the record does establish: that Mr. Saunders is months into chemotherapy treatment for advanced stage cancer and his immune system's ability to fight off viruses such as COVID-19 is compromised in a way that it was not when he first contracted COVID-19 in December 2020. As such, the Court concludes that on the record before it, Mr. Saunders's cancer diagnosis, both in light of the

existence of the COVID-19 pandemic and on its own, establishes circumstances that rise to the level of extraordinary and compelling under § 3582(c)(1)(A)(i).[3]

### 2. **The Government's Arguments**

The Government does not dispute the accuracy of the medical records. (*See* ECF No. 102, at 8.) Rather, the Government's main arguments as to why the record does not establish extraordinary and compelling circumstances for release at this juncture focus on: (1) Mr. Saunders's positive response to chemotherapy treatment; (2) concern that his positive response to treatment will be prematurely disrupted if he is released; (3) the low to nonexistent current COVID-19 rates at FMC Butner; and (4) Mr. Saunders's refusal to get the Pfizer COVID-19 vaccine. In response, Mr. Saunders contends that he is still at risk of contracting COVID-19 at FMC Butner despite the low reported infection rates and despite the fact that he contracted and recovered from COVID-19 in December 2020. Moreover, Mr. Saunders argues that his decision to refuse the vaccine should not be dispositive of his Motion. The Court will address each issue in turn.

The Court first addresses the Government's arguments grounded in Mr. Saunders's (1) positive response to chemotherapy treatment and (2) concern that Mr. Saunders's successful response to treatment while at FMC Butner will be disrupted if he were prematurely released.

---

[3] Mr. Saunders raises several other factors for the Court's consideration that he argues establish a combination of circumstances rising to the level of extraordinary and compelling: (1) that a COVID-19 reinfection is a real possibility and (2) that being labeled as recovered by the BOP does not ensure that Mr. Saunders's long-term health has not been negatively impacted by his December 2020 COVID-19 infection. (ECF No. 98, at 12–14.) Although the Court concludes that Mr. Saunders's cancer diagnosis, active chemotherapy treatment, and age rise to the level of extraordinary and compelling, both outside the COVID-19 pandemic context and in light of it, the Court makes the following observations regarding Mr. Saunders's additional arguments.

First, the Court agrees that a "recovered" label does not "ensure[] that [Mr. Saunders] is not currently suffering from lingering or latent effects caused by contraction of this virus . . . or that his long-term health has not been negatively impacted." *See United States v. Davidson*, No. 17-00334, 2020 WL 4877255, at *20 (W.D. Pa. Aug. 20, 2020) (internal quotation marks omitted). Second, the Court agrees that reinfection is not merely speculative, especially taking into account Mr. Saunders's eventual transport back to USP Thomson upon completion of chemotherapy. *See United States v. Skrine*, No. 15-00060, 2021 WL 71233, at *7 n.7 (W.D. Pa. Jan. 8, 2021) (explaining that where an inmate had been infected twice, "such medical concerns are not hypothetical or inchoate").

Although it is undisputed that Mr. Saunders is responding well to treatment, the Court finds that the specific context in which Mr. Saunders is doing well to be an important observation to make here. As aptly stated by defense counsel at oral argument, Mr. Saunders is doing "well" for a man who has been diagnosed with an incurable advanced-stage cancer living in a federal prison. In the Court's estimation based on the information available to it, stage IVb follicular lymphoma is a serious diagnosis, regardless of whether the individual is at the moment responding favorably to treatment. And while the Court is permitted to take into account a defendant's access to healthcare or rehabilitative care in prison, access to rehabilitative care—which includes medical care, s*ee United States v. Ocampo*, 633 Fed. App'x 115, 117 (4th Cir. 2016)—is not a "valid reason, standing alone, to deny [Mr. Saunders's] motion for compassionate release." *United States v. Greenlaw*, No. 18-00098, 2020 WL 5880467, at *10 (D. Maine Oct. 2, 2020) (discussing *Tapia v. United States,* 564 U.S. 319 (2011)) (explaining that "it is not clear that the *Tapia* holding applies to an incarcerated defendant's motion for compassionate release"); *see, e.g.*, *Tapia,* 564 U.S. at 331 ("Congress did not intend that courts consider offenders' rehabilitative needs when imposing prison sentences[.]").

Here, while the Court agrees with the Government that Mr. Saunders is receiving sufficient medical care at FMC Butner and fortunately responding well to said treatment, such is not grounds to deny release. Moreover, the Court is unconvinced by the Government's argument that "[r]eleasing Mr. Saunders now would only risk disrupting his medical treatment and continuing progress" as grounds to deny his motion for compassionate release (ECF No. 102, at 9). *See Greenlaw*, 2020 WL 5880467, at *10 (discussing *Tapia,* 564 U.S. at 219). In the Court's judgment, the Government's argument on this point to a degree boils down to contending that Mr. Saunders

is better off in federal prison, rather than being back in the community. The Court believes it would be both striking and improvident to require Mr. Saunders to stay in federal prison for that reason.

The Government next points to the low to nonexistent current active COVID-19 case count at FMC Butner as evidence that Mr. Saunders's fear of a second COVID-19 infection is merely speculative, which, if accurate, would be a position that the Third Circuit in *Raia* made plain cannot serve as grounds for compassionate release. *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Although a correct statement of the prevailing law, the Court observes that the pandemic is still ongoing, and a meaningful portion of the BOP staff and other inmates at FMC Butner and USP Thomson remain unvaccinated, the risk of COVID-19 transmission is thus not necessarily eliminated in a confined, congregate, and custodial setting. In the Court's view, the record reflects that Mr. Saunders's infection risk is more than mere speculation of "the possibility that [COVID-19] may spread to a particular prison." *Id*. at 597. His risk is tangible. Not only has Mr. Saunders been infected once before in federal prison, but upon conclusion of his chemotherapy treatment at FMC Butner, he will presumably be transported back to USP Thomson. The movement required for transport from North Carolina to Illinois would itself place Mr. Saunders at an increased risk of coming into contact with the virus a second time.

Moreover, although FMC Butner, where Mr. Saunders resides, currently reports zero active COVID-19 cases among inmates and staff, *see* Fed. Bureau of Prisons, *BOP: COVID-19 Update*, https://www.bop.gov/coronavirus/ (last updated June 22, 2021), one week ago, on June 14, 2021, FMC Butner reported one inmate with an active COVID-19 infection and one staff member with an active infection. *See id.* (as reported on June 14, 2021). Two weeks prior to that, on June 3, 2021, FMC Butner reported one inmate with an active COVID-19 infection and three staff with active COVID-19 infections. *See id.* (as reported on June 3, 2021). This data shows that over the

course of several weeks, the infection rate at the facility where Mr. Saunders currently resides has fluctuated. In total, FMC Butner reports that through the course of the pandemic, 135 inmates and 57 staff members have been infected with and recovered from COVID-19.

While the BOP website does not report the exact vaccination rate among inmates and staff at FMC Butner specifically, it does report the inmate and staff vaccination rate across all FCC Butner facilities (the BOP's operations in Butner extend across four facilities: FCI Butner Low, FCI Butner Medium I, FCI Butner Medium II, and FMC Butner). Those numbers reflect that 2433 out of 3463[4] inmates across the BOP's Butner facilities are fully inoculated while 896 staff members[5] are fully inoculated. *See* Fed. Bureau of Prisons, *BOP: COVID-19 Update*, https://www.bop.gov/coronavirus/ (last updated June 22, 2021).

Based on the foregoing, the Court observes that the uncertain vaccination rate among staff and the uncertain vaccination rate of staff and inmates overall at FMC Butner coupled with the approximate 1000 inmates remaining unvaccinated at the FCC Butner facilities, taken together, create an additional element of tangible concern for reinfection—one that the Court considers to be non-speculative and supportive of its finding of extraordinary and compelling circumstances.

As for the infection rate at USP Thomson—where Mr. Saunders would presumably return after his chemotherapy treatment is completed—that BOP facility currently reports zero active COVID-19 infections. However, past infection rates at USP Thomson illustrate that the virus's existence in the facility is not merely speculative, as reflected in the aggregate number of infections reported through the course of the still ongoing pandemic: a total of 528 inmates at USP Thomson

---

[4] The Court calculated the aggregate inmate population number at FCC Butner by totaling the reported inmate populations across all four FCC Butner facilities.

[5] Using the BOP's website, the Court was unable to discern the total number of staff members working at one of FCC Butner's facilities or at USP Thomson.

have contracted and recovered from COVID-19 while a total of 100 staff members have contracted and recovered from the virus. *See* Fed. Bureau of Prisons, *BOP: COVID-19 Update*, https://www. bop.gov/coronavirus/ (last updated June 22, 2021). Moreover, the low vaccination rate, at least as it is definitively reflected in the inmate population at USP Thomson, creates cause for concern: the BOP reports that 544 out of 1327 inmates at USP Thomson, which amounts to only 40% of the inmate population, are fully vaccinated while 215 staff members out of an unknown total are fully vaccinated. *Id*.

Finally, the Court addresses Mr. Saunders's decision to refuse the Pfizer COVID-19 vaccine, and the Government's assertion that his refusal should undercut Mr. Saunders's extraordinary and compelling argument. Nothing within the record suggests that Mr. Saunders provided a reason for his decision to refuse the vaccine, such as an allergy or religious purpose. What Mr. Saunders does argue in his briefing is that (a) lack of access to information about the vaccine in the prison setting, (b) widespread public distrust of vaccines, and (c) accounts of past medical experimentation on prisoners and Black Americans reflecting (d) historical medical racism (ECF No. 105, at 6–10) are reasons sufficient to justify Mr. Saunders's decision to decline the vaccine. However, Mr. Saunders does not argue that factors noted in (c) or (d) actually motivated his decision, only that they would have been sufficient to do so. And as to the factors (a) and (b), his alleged reliance is rather vague.

From the Court's perspective, the submitted articles relied on to support Mr. Saunders's generalized argument that his decision to refuse the vaccines is justified do not carry the day. First, to be sure, the Tuskegee Study referenced by Mr. Saunders was an example of past medical experimentation combined with abject racism, which has properly been condemned as "ethically unjustified." *See* Ctrs. for Disease Control & Prevention, *Tuskegee Study Timeline*,

https://www.cdc.gov/tuskegee/timeline.htm (last visited June 4. 2021). And while that moment in history demonstrably presents an abhorrent example of racism in the medical field, there is nothing within this record, or either generally known by this Court or that can be accurately or readily determined from sources whose accuracy cannot be reasonably questioned, to suggest that the Tuskegee Study and its aftermath in any way accurately represents today's state of affairs relative to the COVID-19 vaccine. Next, while the Court acknowledges that general mistrust in or weariness of vaccinations is a viewpoint that exists in some segments of society, it does not find that viewpoint to be a valid justification to decline vaccination, especially when 65.4% of Americans have received at least one dose of a COVID-19 vaccination to date. *See* Ctrs. for Disease Control & Prevention, *COVID Data Tracker*, https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last updated June 22, 2021). And, in any event, the record does not reveal that Mr. Saunders actually relied upon or articulated either of those reasons as the basis for his declination of the COVID-19 vaccine. Rather, they appear to be *post hoc* rationales advanced as a rejoinder to the Government's argument. As such, the Court concludes that Mr. Saunders's proffered reasons for refusing the vaccine, without more, do not carry the day.

However, the Court ultimately concludes that Mr. Saunders's decision to refuse the vaccine does not change the Court's finding of extraordinary and compelling circumstances. In the Court's view, based on the record before it and medical literature as now developed, it remains uncertain whether Mr. Saunders, if he had been vaccinated, would be sufficiently protected from severe illness if exposed to COVID-19 a second time in light of his blood cancer diagnosis and his immunocompromised state. *See* Roch Houot et al., *Could anti-CD20 therapy jeopardise the efficacy of a SARS-CoV-2 vaccine?*, Eur. J. Cancer 136 (2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7315961/pdf/main.pdf.

After the record closed in this matter, Mr. Saunders filed a supplement (ECF No. 109) rebutting the Government's vaccine argument, to which the Government responded. (ECF No. 110.) As noted earlier, the Court accepts both Mr. Saunders's supplement and the Government's response into the record. In Mr. Saunders's supplement, he references a recent UPMC medical study, which concluded that "nearly half of the patients . . . with hematological malignancies do not generate antibodies" after receiving the COVID-19 vaccine, *see* ECF No. 109, at 2 (citing Mounzer Agha et al., *Suboptimal response to COVID-19 mRNA vaccines in hematologic malignancies patients*, medRxiv (April 7, 2021), https://www.medrxiv.org/content/10. 1101/2021.04.06.21254949v1.full-text). Mr. Saunders also directs the Court's attention to an updated CDC disclaimer regarding the COVID-19 vaccine, which states: "If you have a condition or are taking medications that weaken your immune system, you may NOT be fully protected even if you are fully vaccinated." Ctrs. for Disease Control & Prevention, *When You've Been Fully Vaccinated*, https://www.cdc.gov/ coronavirus/2019-ncov/vaccines/fully-vaccinated.html (last updated May 16, 2021).

In response, the Government argues that "this Court has already determined that a defendant's voluntary refusal to accept the COVID-19 vaccine 'significantly undermines the foundational premises of his Motion.'" (ECF No. 110 (citing *United States v. Robinson*, No. 16-00094, 2021 WL 719658 (W.D. Pa. Feb. 23, 2021) and *United States v. Brown*, 2:16-00169, 2021 WL 1920868 (W.D. Pa. May 13, 2021)).) In closing, the Government states that "given defendant's burden, the Court should not ignore that he declined to provide self-care and take steps to mitigate his risk of a severe COVID-19 infection." (*Id.*)

First, the Court concludes that the Government has not shown on the record that had Mr. Saunders been vaccinated, the risk of serious illness from a COVID-19 infection arising from his particular medical conditions giving rise to extraordinary and compelling circumstances would

likely be actually mitigated.[6] (*See* ECF No. 102, at 11.) Even taking judicial notice of the submitted articles as requested by the Government, the Court concludes that the literature now entered into record does not satisfy the Government's burden to show that in Mr. Saunders's specific circumstances, a vaccination would make a difference. Rather, the articles the Government cites support the conclusion that individuals with cancer, at a general level, are highly encouraged to get the vaccine, a sentiment with which the Court does not disagree. Of note, however, not one submitted article discusses the uncertain effectiveness of vaccines for persons undergoing chemotherapy like Mr. Saunders. (ECF Nos. 110-2–110-4.) And only one article addresses the vaccine efficacy response in individuals with blood cancers like Mr. Saunders, in which it was reported that only 54% of individuals in a 67-person study mounted an antibody response post-vaccination. (ECF No. 110-1.)

Finally, the Court notes that more comprehensive articles and studies have been published about the uncertain efficacy of the COVID-19 vaccines in immunocompromised individuals such as those receiving chemotherapy drugs like Bendamustine and Rituxan. *See* Roch Houot et al., *Could anti-CD20 therapy jeopardise the efficacy of a SARS-CoV-2 vaccine?*, Eur. J. Cancer 136 (2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7315961/pdf/main.pdf; Satoshi Yamasaki et al.,

---

[6] Importantly, it was the Government that argued that Mr. Saunders refusal to accept the COVID-19 Pfizer vaccine should obviate Mr. Saunders's extraordinary and compelling circumstances, and it logically follows that it is the Government's burden to demonstrate that point, not Mr. Saunders's to rebut it. That makes sense, since the act of being vaccinated in and of itself would not obviate the existence of extraordinary and compelling medical circumstances. Instead, it is the immunity that the vaccine would generate that would make a difference. Perhaps in the run of the mine case, the Government would need to simply point to the refusal of the vaccine to make its case as to this argument, since in an individual without an immunocompromised condition or treatment, the administration of the vaccine would likely lead to a high level of immunity just as night follows day. On the other hand, where as here the medical records demonstrate that Mr. Saunders has a immunocompromising medical condition that is clinically treated with drugs that would likely exacerbate that situation, it is not enough for the Government to point to the refusal of the vaccine as some sort of talismanic invocation of a conclusive defense. Instead, it would remain the obligation of the Government to demonstrate how and why Mr. Saunders actually getting the vaccine would be a game changer on this issue, specifically in light of his medical condition. It has not done that here.

*Clinical impact of bendamustine exposure on lymphopenia risk after bendamustine and rituximab combination therapy for follicular lymphoma: single institute retrospective study*, Annals of Hematology (Jan. 3, 2021), https://link. springer.com/content/pdf/10.1007/s00277-020-04388-6.pdf ("Coronavirus disease 2019 (COVID-19) raises specific concerns in terms of morbidity and mortality for patients with [follicular lymphoma] because of their immunocompromised status induced by the disease or recent exposure to cytotoxic chemotherapy, especially bendamustine[.]"). Accordingly, while the Court gives consideration to the articles of which the Government asks the Court to take judicial notice, it nonetheless concludes that the Government does not satisfy its burden here, and the fact that Mr. Saunders refused the Pfizer COVID-19 vaccine does not dissipate the existence of extraordinary and compelling circumstances that the Court has concluded exist in this case.

In sum, even though Mr. Saunders's refusal to be vaccinated might in the ordinary course logically cut against his position that his medical conditions rise to the level of extraordinary and compelling when taking into account the COVID-19 pandemic, his refusal does not move the needle here. The specific circumstances of Mr. Saunders's case, considered as a whole, do not support a conclusion that refusing vaccination in and of itself undercuts Mr. Saunders's extraordinary and compelling argument.[7] And in any event, the Court concludes that his cancer

---

[7] The Court does not decide here whether the declination of a COVID-19 vaccination would or would not bar compassionate release relief as a definitional matter, particularly in circumstances dissimilar to those which are now presented by Mr. Saunders's specific case. *See United States v. Austin*, No. 15-20609, 2021 WL 1137987, at *2 (E.D. Mich. Mar. 25, 2021), *appeal docketed*, No. 21-1363 (6th Cir. Apr. 14, 2021) (declination of available COVID-19 vaccine is a categorical bar to compassionate release relief).

Whether and how the declination of the COVID-19 vaccine would impact the compassionate release calculus in other cases therefore remains an open question before this Court. The Court observes that there appear to be several factors that would counsel caution in considering a categorical approach as to that issue. First, any sentencing decision is to be individualized to the circumstances of the given case. Second, as here, there may be specific medical or other legitimate reasons that would properly impact the consideration of the request for relief that would be obviated by a categorical approach.

The Court also does not resolve the likely next issue if the declination of vaccination were considered to be a categorical bar to compassionate release relief: whether a person in federal custody who is offered the COVID-19 vaccine may incur as a consequence of a declination the denial of compassionate release relief based directly (cont.)

diagnosis on its own satisfies the extraordinary and compelling prong. Given these particularized

circumstances and on this specific record, the Court concludes that Mr. Saunders has met his

burden to establish extraordinary and compelling circumstances for release.

### C.  The § 3553(a) Factors

Even though the Court finds that on the record presently before it there is an "extraordinary

and compelling" reason sufficient to authorize Mr. Saunders's release, it must also consider

whether release is appropriate in light of the factors set forth in § 3553(a). Specifically, "in

considering the section 3553(a) factors, [the Court] should assess whether those factors outweigh

the 'extraordinary and compelling reasons' warranting compassionate release, particularly whether

compassionate release would undermine the goals of the original sentence." *United States v. Bess*,

455 F. Supp. 3d 53, 66 (W.D.N.Y. Apr. 22, 2020) (citation omitted).

The determination of "whether to reduce an eligible defendant's term of incarceration for

compassionate release after considering the § 3553(a) factors is committed to the discretion of the

[district court]." *United States v. Jones*, No. 12-000038, 2020 WL 3871084, at *4 (W.D. Pa. July

8, 2020) (citing *United States v. Pawlowski*, 967 F.3d 327 (3d Cir. June 26, 2020)). That discretion

includes the district court's authority to consider the length of the defendant's original custodial

---

on a refusal to be vaccinated, given the current "emergency use authorization" ("EUA") status of each of the COVID-19 vaccines administered in the United States. *See* Ctrs. for Disease Control & Prevention, *Safety of COVID-19 Vaccines*, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/safety/safety-of-vaccines.html (last updated Apr. 30, 2021). The administration of a medical product subject to an EUA requires that the recipient be advised in advance of the "consequences" of the refusal to accept administration of the medical product to permit informed consent. *See* 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III).

The Court is not aware of any cases considering and determining whether the inability to pursue compassionate release relief would be considered to be a "consequence" of a refusal to be vaccinated for the purposes of that provision. *See generally Aviles v. Blasio*, No. 20-9829, 2021 WL 796033, at *23 n.13 (S.D.N.Y.  Mar. 2, 2021) (noting but not resolving the impact of EUA status relative to COVID-19 tests in public schools with parental consent); *John Doe No. 1 v. Rumsfeld*, No. 03-707, 2005 WL 1124589, at *1 (D.D.C. Apr. 6, 2005) (noting but not resolving the impact of EUA status as to anthrax vaccines to be administered to members of the armed forces). The record does not reflect that the consent form involved in this case addressed (one way or another) the impact of Mr. Saunders's accepting or declining the COVID-19 vaccine on his compassionate release motion.

sentence, including the portions served and remaining, when weighing the § 3553(a) factors. *Pawlowski*, 967 F.3d at 330–31.

Here, Mr. Saunders has served fourteen years of his originally imposed two hundred four (204) month, or seventeen-year, sentence. He argues that reducing his custodial sentence to time served would result in a sentence that would be sufficient but not greater than necessary to achieve the goals of sentencing. (ECF No. 98.) In particular, Mr. Saunders argues that "[i]n the age of COVID-19, 'sufficient but not greater than necessary' takes on new meaning, and particular significance, for vulnerable at-risk inmates," like Mr. Saunders. (*Id.* at 18) While recognizing "that the instant offense was without question serious," Mr. Saunders notes that that other "[c]ourts have rejected the argument that an inmate's history of robbery necessarily means he presents a current danger to the community if released." (ECF No. 98, at 21–22 (collecting cases).) Further, Mr. Saunders argues that the support of his family in addition to his five-year term of supervised release will be sufficient to deter him and others from unlawful conduct and would nonetheless protect the public. (*Id.* at 23.)

In response, the Government argues that the sentencing factors continue to support the custodial sentence that the Court originally imposed. Specifically, the Government argues that Mr. Saunders is a career offender who, most recently, committed three bank robberies, and has collected twenty misconducts while incarcerated. The Government says that any reduction in his sentence would not reflect the nature and seriousness of Mr. Saunders's current conviction, his prior criminal record, and his demonstrated risk of recidivism. (ECF No. 102, at 2). There is also victim opposition to Mr. Saunders's early release. (ECF No. 102-4.) Finally, as a result of his extensive prison misconduct, Mr. Saunders has lost over 400 days in Good Conduct Time ("GCT"). (*Id.* at 17; ECF No. 103-1).

The question before the Court is whether a "sufficient" sentence in the context of all of the current circumstances now presented requires that most or all of that period of time remaining in Mr. Saunders's sentence (approximately 28 months) be spent in BOP institutional custody. The Court concludes that it does. A reduction of Mr. Saunders's custodial sentence is inappropriate at this time because the § 3553(a) factors counsel against release

Even in light of the COVID-19 pandemic and Mr. Saunders's medical conditions, the Court is duty bound to consider the § 3553(a) factors in the course of addressing the compassionate release motion before it. In particular, the Court finds significant (1) the seriousness of Mr. Saunders's offense, *see* § 3553(a)(2)(A); (2) the need to "provide the defendant with . . . correctional treatment in the most effective manner," *see* § 3553(a)(2)(D), in consideration of Mr. Saunders's extensive prison misconduct record resulting in the loss of 400 days of GCT; and (3) the history and characteristics of Mr. Saunders, *see* § 3553(a)(1), which makes relevant Mr. Saunders's lengthy criminal conviction history and poor decision-making while in prison—the latter of which in particular runs counter to an argument that Mr. Saunders is rehabilitated or that his current sentence, at this juncture, has sufficiently deterred future misconduct. On the record now before the Court, consideration of the § 3553(a) factors support a conclusion that Mr. Saunders's original sentence of two hundred four (204) months continues to be sufficient and not greater than necessary. Thus, releasing Mr. Saunders before his BOP custodial time concludes would run counter to the purposes of sentencing, in accord with the § 3553(a) factors and relevant policy statements, and the Court concludes that his extraordinary and compelling circumstances do not counterbalance those considerations. Mr. Saunders offense was serious, his record of convictions is of the same nature, and his conduct record in prison, including of recent vintage, does little to mitigate those realities. Given that while seriously ill, Mr. Saunders is receiving medical care of appropriate quality and

scope via the BOP with currently positive results, the Court concludes that the record as a whole, considering the entire picture before the Court, does not support reduction of Mr. Saunders's sentence at this time.

In sum, Mr. Saunders's serious criminal history of convictions for serious criminal conduct and extent of his disciplinary infractions in prison counsel against a reduction in sentence/release at this time.

## IV.    **CONCLUSION**

The Court has considered the relevant factors set forth in § 3582(c), as well as the applicable policy statements issued by the Sentencing Commission and the factors set forth in § 3553(a). The Court finds and concludes that Mr. Saunders's Motion is properly before it and that his recent advanced-stage cancer diagnosis rises to an "extraordinary and compelling" level, both on its own and in light of the COVID-19 pandemic. The Court ultimately concludes, however, that to reduce Mr. Saunders's sentence would so undermine the original goals of sentencing in this case such that a sentence modification at this time would be inappropriate. Accordingly, Mr. Saunders's Motion to Reduce Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) (ECF No. 98) is hereby DENIED without prejudice to its reassertion.

An appropriate Order will issue.

 s/ Mark R. Hornak
Mark R. Hornak
Chief United States District Judge

Dated: June 23, 2021
cc:      All counsel of record